John DOE, Plaintiff,

v.

Bill PRYOR, et al., Defendants.

No. Civ.A. 99–T–730–N.

United States District Court,
M.D. Alabama,
Northern Division.

Aug. 16, 1999.

Kyla L. Groff, Alec Brown & Associates, P.C., Alexander City, AL, David A. Gespass, Gespass & Johnson, Birmingham, AL, Scott A. Boykin, Birmingham, AL, Shannon L. Holliday, Wetumpka, AL, for John Doe, plaintiff.

Courtney Wayne Tarver, Raymond L. Jackson, Jr., Office of the Attorney General, Montgomery, AL, Alice Ann Byrne, Office of the Attorney General, Assistant Attorney General, Montgomery, AL, Scott L. Rouse, Office of the Attorney General, Montgomery, AL, for Bill Pryor, defendant.

Michael W. Robinson, Department of Public Safety, Montgomery, AL, Scott L. Rouse, Office of the Attorney General, Montgomery, AL, for Mike Sullivan, defendant.

Constance Caldwell Walker, Thomas T. Gallion, III, Haskell, Slaughter, Young & Gallion, Montgomery, AL, for D.T. Marshall, in his official capacity as Sheriff of Montgomery County, Alabama, defendant.

George B. Azar, Azar & Azar, Montgomery, AL, for John Wilson, in his official capacity as Chief of Police of the City of Montgomery, Alabama, defendant.

*OPINION*

MYRON H. THOMPSON, District Judge.

Pseudonymous plaintiff John Doe claims in this lawsuit that the 1996 Alabama Community Notification Act, as amended, 1975 Ala.Code §§ 15–20–20 to 15–20–24, is unconstitutional on its face and as applied to him. The plaintiff was convicted of the federal offense, committed at the age of 19, of receiving in interstate commerce a videotape depicting child pornography in violation of 18 U.S.C.A. § 2252(a)(2). The Notification Act did reach certain child pornography offenses until it was amended in 1998, two years after his federal offense. He names as defendants the Attorney General of the State of Alabama, the Director of the Alabama Department of Public Safety, and the Chief of Police of the City of Montgomery, Alabama. Jurisdiction is proper under 28 U.S.C.A. §§ 1331, 1343(a)(3).

The lawsuit is currently before the court on the plaintiff's motion for a preliminary injunction prohibiting enforcement of the Act's community-notification provisions against him pending resolution of this lawsuit. For the reasons set forth below, the motion will be granted. The court does not reach at this time the issues of the constitutionality of the Act on its face or as applied to the plaintiff in all respects but rather makes the limited preliminary holding that the process by which state officials found the plaintiff (who was convicted of a federal and not an Alabama offense) to be

covered by the Act lacked the safeguards necessary to assure that the Act is not being applied to him in error.

## I. BACKGROUND

### A. The Act

The Community Notification Act is Alabama's version of 'Megan's Law.'[1] It is among the broadest and most restrictive of such laws in the nation.[2] It requires individuals convicted of certain offenses to register with law enforcement officials, and it requires those officials to notify members of the public whenever a registrant moves into their community. It also places significant restrictions on where and with whom a registrant may live and work.

The Alabama Legislature first passed the Community Notification Act in 1996 and has since amended it twice. The original Act went into effect on May 29, 1996. *See* Ala. Act No. 96–793. The first amendment went into effect on August 1, 1998. *See* Ala. Act No. 98–489. The 1998 amendments expanded the Act to reach certain child pornography offenses. The second amendment, passed earlier this year, will go into effect on September 1, 1999. *See* Ala. Act No. 99–572. Except as otherwise noted below, no differences between the 1998 and 1999 amendments are relevant here.

#### 1. Persons to Whom the Act Applies

Any person convicted of a "criminal sex offense" as defined by the Act is a "criminal sex offender" subject to the Act's registration, notification, residency, and employment provisions. "Criminal sex offense" includes rape, sodomy, sexual torture, sexual abuse, incest (when the offender is an adult and the victim is a minor), enticement and promoting prostitution. *See* 1975 Ala.Code § 15–20–21(a)(5). "Criminal sex offense" also includes kidnapping (if the victim is a minor) and violations of the Alabama Child Pornography Act.[3] *Id.* Any solicitation, attempt or conspiracy to commit these offenses is a "criminal sex offense" under the Act as well, as is any crime, committed in another jurisdiction, which would constitute one of the enumerated offenses if committed in Alabama. *Id.* The Act does not indicate who determines whether it applies to a person convicted in another jurisdiction or how that determination is to be made, but the Alabama Attorney General has declared that "authorities charged with the implementation of the Community Notification Act" should examine whether "the elements of the crime for which the person was convicted correspond to the elements of a crime listed in section 15–20–21(5)a–k. . . ." Op.Ala. Att'y Gen. No. 99–00082, at 2 (Jan. 13, 1999).[4] The Act provides no process by which an individual deemed to be a "criminal sex offender" may challenge that determination.

Although the Community Notification Act is not expressly retroactive, it contains no language limiting its application to those convicted of a criminal sex offense after the Act was passed. The Alabama Attorney General has interpreted it to apply to individuals convicted prior to the Act whenever they establish a new residence within the State. *See* Op.Ala. Att'y

---

**1.** Megan Kanka was the seven-year old victim of a sexual assault and murder in New Jersey in 1994. The circumstances of her death prompted that State and many others to enact registration and notification laws for criminal sex offenders.

**2.** *See State v. C.M. et al.,* CR–98–0447, 1999 WL 274903, at *2 (Ala.Crim.App. May 5, 1999).

**3.** The Alabama Child Pornography Act proscribes: (1) the dissemination or public display of child pornography, 1975 Ala.Code § 13A–12–191; the possession of, and possession with intent to disseminate, child pornography, *id.* §§ 13A–12–192; and (3) the production of child pornography, *id.* § 13A–12–196 and 13A–12–197.

**4.** While an opinion of the Attorney General is not binding authority in Alabama, it may constitute persuasive authority. *See Alabama–Tennessee Natural Gas Co. v. Southern Natural Gas Co.,* 694 So.2d 1344, 1346 (Ala.1997). For a database of Alabama Attorney General opinions published after 1978, see <http://www.ago.state.al.us/opinion.cfm>.

Gen. No. 99–00040 (Nov. 16, 1998); Op.Ala. Att'y Gen. No. 99–00029 (Oct. 29, 1998); Op.Ala. Att'y Gen. No. 99–00011 (Oct. 19, 1998); Op.Ala. Att'y Gen. No. 98–00164 (June 16, 1998); Op.Ala. Att'y Gen. No. 97–00255 (Aug. 11, 1997) (overruled in part). The 1999 amendment codifies these opinions. *See* Ala. Act No. 99–572, § 3 (to be codified at 1975 Ala.Code §§ 15–20–33(c)). Thus, a person who completed his or her sentence for a criminal sex offense in 1975, for example, will be required to register only if he or she wishes to establish a new residence.

The Act is also unlimited in duration. The current version contains no language limiting its prospective or retrospective application to a specified length of time. Thus, the Act applies with equal force to a person convicted of a criminal sex offense in 1999 as it does to a person convicted in 1909, and a person subject to the Act today is subject to it for life. The 1999 amendment limits the scope of the Act to 25 years from the date of release unless the person was convicted of more than one criminal sex offense or a criminal sex offense involving more than one victim. *See id.* § 3 (to be codified at 1975 Ala.Code § 15–20–33(a)).

### 2. Residency and Employment Restrictions

The Act prohibits criminal sex offenders from establishing a residence or accepting employment "within 1,000 feet of the property on which any public school, private or parochial school, licensed daycare center, or any other child care facility is located." 1975 Ala.Code § 15–20–22(e). The current version of the Act does not define these terms, but the Alabama Attorney General has interpreted "child care facility" to mean "facilities that are required to be licensed or certified by the Department of Human Resources or other agency, or those facilities specifically exempted by section 38–7–3 of the Code of Alabama." Op.Ala. Att'y Gen. No. 99–00039, at 3 (Nov. 13, 1998). Such facilities include daycare homes, group homes, foster-family homes, and church-based pre-schools. *Id.*

at 2. The 1999 amendment defines the term "child care facility" in a manner consistent with this interpretation and clarifies the meaning of "school." *See* Ala. Act No. 99–572, § 3 (to be codified at 1975 Ala.Code § 15–20–21(2), 15–20–21(9)).

The Act also prohibits criminal sex offenders from establishing a residence "or any other living accommodation" where a minor resides unless the offender is the minor's parent. 1975 Ala.Code § 15–20–22(g); *see also* Op.Ala. Att'y Gen. No. 98–00214 (Sept. 9, 1998) (stating that the term "parent" as used in the Act does not include a step-parent). The parental exception does not apply, however, if the offender's parental rights have been or are in the process of being terminated, or if the offender's victim was his or her minor or adult child. *See* 1975 Ala.Code § 15–20–22(g); *see also* Op.Ala. Att'y Gen. No. 99–00034 (Nov. 3, 1998) (stating that the term "child" as used in the act does not include a step-child).

The Act places additional limitations on the criminal sex offender's contact with his or her former victims. First, it prohibits criminal sex offenders from establishing a residence or any other living accommodation "within 1,000 feet of the property on which any of his or her former victims, or the victims' immediate family members reside. . . ." 1975 Ala.Code § 15–20–22(f). Second, it provides that an offender may not "willfully or knowingly come within 100 feet of any of his or her former victims, except as elsewhere provided by law, or make any visual or audible sexually suggestive or obscene gesture, sound, or communication at or to a former victim." *Id.* § 15–20–22(f).

Finally, the Act prohibits an offender from changing his or her name. *See id.* § 15–20–22(i).

Any knowing violation of the residency restrictions is a Class C felony. *See id.* § 15–20–24.

### 3. Registration

Thirty days prior to release from state or local custody, criminal sex offenders must declare in writing the address at which they intend to reside upon release. *See* 1975 Ala.Code § 15–20–21(b). The Act requires the relevant correctional officials then to register this address with law enforcement officials. *See id.* Registration must also include a description of the offense, the offender's fingerprints, a current photograph and other information needed to identify and trace him or her. *See id.*

The Act requires the State Board of Pardons and Paroles to register criminal sex offenders who were on probation or parole as of June 30, 1998, and to order the offenders to report to the appropriate law enforcement agency for fingerprinting and photographing. *See id.* § 15–20–21(j).

Registration also applies to criminal sex offenders who are convicted after the effective date of the Act but who are not sentenced to custody. *See id.* § 15–20–21(k). If a sentencing court does not impose a sentence of incarceration for a criminal sex offense, the court itself must register the offender with law enforcement officials within 24 hours of release. *See id.*

The Act requires registrants to verify their address shortly after release and then annually thereafter. *See id.* § 15–20–21(h)(1). Within 10 days of receipt of a verification form sent by the Alabama Department of Public Safety, an offender must report in person to law enforcement officials for fingerprinting and photographing. *See id.* § 15–20–21(h)(2).

All persons subject to the Act are required to notify law enforcement officials at least 30 days prior to any change in residence. *See id.* § 15–20–22(d). This provision serves as the registration requirement for any person not registered by some other means.

With one small exception, any knowing violation of these registration requirements is a Class C felony. *See id.* § 15–20–24; *but see id.* § 15–20–21(b)(1) (failure to declare a residence prior to release is a Class A misdemeanor).

### 4. Community Notification

The Act provides for mandatory community notification upon the release of a criminal sex offender and upon receipt by law enforcement officials of the required notice that an offender intends to change his or her legal residence. *See* 1975 Ala.Code §§ 15–20–22(a), 15–20–22(c).

The breadth of the required notice varies by location. In Birmingham, Huntsville, Mobile and Montgomery, notice must go out to all residences within 1,000 feet of the offender and to all schools and childcare facilities within three miles. *See id.* § 15–20–22(a)(1). In all other Alabama cities with a resident population of 5,000 or more, notice must go out to all residences within 1,500 feet of the offender and to all schools and childcare facilities within three miles. *See id.* § 15–20–22(a)(2). Everywhere else, notice must go out to all residences within 2,000 feet of the offender and to all schools and childcare facilities within six miles. *See id.* § 15–20–22(a)(3).

Notification occurs by distribution of a "community notification flyer." *Id.* § 15–20–21(a)(2). The Act provides that the flyer "shall contain" the following information about an offender:

"Name; actual living address; sex; date of birth; complete physical description, including distinguishing features such as scars, birth marks, or any identifying physical characteristics; and a current photograph. This notification shall also include a statement of the criminal sex offense for which he or she has been convicted, including the age and gender of the victim, the geographic area where the offense occurred, and the date upon which the criminal sex offender will be released. This notification shall also include a statement that the same information is on file [with law enforcement officials], and that the information will be available to the general public for inspection and identification purposes during regular business hours."

*Id.* The Act requires law enforcement officials to distribute the flyer by hand or by regular mail, and it authorizes them to provide notification by posting the flyer, by publicizing it in a local newspaper, by posting it on the Internet or by "other means available."[5] *Id.* § 15–20–22(a).

### B. The Plaintiff

The plaintiff pled guilty in December 1996 to one count of receiving child pornography in interstate commerce in violation of 18 U.S.C.A. § 2252(a)(2). He was sentenced to five years of probation. The conviction arose from the plaintiff's receipt of one videotape in a sting operation run by the United States Customs Service. He was 19 years old at the time of the offense.

The plaintiff had lived in the same apartment with his wife in Montgomery, Alabama, for the past five years until he was recently forced to move due to a pending divorce. He is now living in a new apartment not far from his prior residence.

When the plaintiff informed his federal probation officer of his need to move, the officer told him that he was subject to the Alabama Community Notification Act, and, in accordance with 18 U.S.C.A. § 4042(C), the probation officer also notified the Alabama Bureau of Investigation Division of the Department of Public Safety that the plaintiff might fall under the Act's coverage. Pursuant to § 15–20–21(a)(5)(1) of the Act, an official in the Investigation Division, who is neither a lawyer nor a judge, determined without a hearing or any input from the plaintiff that the federal statute under which the plaintiff had been convicted, 18 U.S.C.A. § 2252(a)(2), was sufficiently comparable to the state statute that prohibits possession of child pornography, 1975 Ala.Code § 13A–12–192, to conclude that, because the plaintiff had changed his residence, he now fell within the Act's coverage. The plaintiff

registered under the Act on July 13, 1999, but then filed this lawsuit on July 16 to keep the state officials from enforcing the Act against him. On July 16, this court entered an order temporarily restraining enforcement of the Act against the plaintiff pending resolution of the plaintiff's motion for preliminary injunction.

## II. DISCUSSION

The Eleventh Circuit Court of Appeals has established a four-prong test for the district court to apply when determining whether a preliminary injunction should issue. Under this test, the movant must demonstrate: "(1) a substantial likelihood she will ultimately prevail on the merits; (2) that she will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that if issued, the injunction would not be adverse to the public interest." *Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir.1988). As explained below, the plaintiff satisfies each part of the four-prong test.

### A. Likelihood of Success

The plaintiff challenges the Community Notification Act on six grounds: (1) procedural due process; (2) substantive due process; (3) the overbreadth doctrine; (4) the equal-protection clause; (5) the ex-post-facto clause; and (6) the bill-of-attainder clause. For purposes of the preliminary injunction, however, he raises only those claims which might affect the enforcement of the notification provisions of the Act against him.

#### 1. Procedural–Due–Process Claim

To succeed on his procedural-due-process claim under the fourteenth amendment to the United States Constitution as

---

5. The Alabama Department of Public Safety maintains an online database of registered criminal sex offenders. *See* <http://www.gsiweb.net>. The site allows anyone with access to the world wide web to search for regis-

trants by name, city, county or zip code. Users can view the community notification information for each offender and can even display a detailed map showing the location of the offender's home address.

enforced by 42 U.S.C.A. § 1983, the plaintiff will have to establish (1) that the Community Notification Act deprives him of life, liberty or property; and (2) that the procedures attending the deprivation are constitutionally inadequate. *See Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989) (prescribing a two-part inquiry for procedural-due-process claims); *see generally* U.S. Const. amend. XIV, § 1 ("nor shall any state deprive any person of life, liberty, or property, without due process of law").

### a. The Liberty Interest

The plaintiff argues that community notification under the Act will deprive him of a liberty interest in reputation as defined by the Supreme Court in *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).[6]

In *Constantineau*, the Court struck down a Wisconsin law that authorized government officials to post in liquor stores a notice prohibiting the gift or sale of alcohol to persons listed on the notice whom the officials deemed to be a danger to themselves, to their families or to their communities though excessive drinking. The statute provided such persons with no notice or opportunity to be heard prior to the officials' determination that their drinking made them a danger. Finding that this determination attached a "badge of infamy" to persons listed on the notice, the Court concluded that due process was required and that the Wisconsin statute was unconstitutional on its face. 400 U.S. at 437, 91 S.Ct. at 510. "Where a person's

good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Id.*

The next year, in *Roth*, the Court considered the claim of a non-tenured professor at a state university who was not rehired after his one-year contract expired. The Court held that the State had not deprived the professor of a liberty interest in his reputation because the university had not given any reasons for its decision "that might seriously damage his standing and associations in his community." 408 U.S. at 573, 92 S.Ct. at 2707. "It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dishonesty, or immorality." *Id.* The Court suggested, however, that its holding might have been different if the university had "imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." *Id.*

In *Paul*, two police chiefs distributed to local retail stores a flyer with the mug shots of persons considered to be 'active shoplifters.' The plaintiff, whose name and photograph appeared in the flyer even though he had not been convicted of shoplifting, sued in federal court for defamation as a violation of the due-process clause under 42 U.S.C.A. § 1983. The court of appeals found that the flyer had deprived the plaintiff of a liberty interest in reputation, but the Supreme Court disagreed.

Expressing concern that the plaintiff "would make the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States," the Court in *Paul* found that its prior decisions "do[ ] not

---

**6.** The court notes that the Alabama Constitution specifically protects an individual's interest in reputation. *See* 1901 Ala. Const. art. I, § 13 ("every person, for any injury done him, in his lands, goods, person, or reputation, shall have a remedy by due process of law"). The Alabama Supreme Court has further held that this interest "is protected by the Constitution equally with the right to enjoyment of

life, liberty, and property." *Marion v. Davis*, 217 Ala. 16, 114 So. 357, 358 (1927); *see also McCollum v. Birmingham Post Co.*, 259 Ala. 88, 65 So.2d 689, 695 (1953). Neither side in this case has raised this issue at this stage, however, so the court will not consider this provision in its discussion of the plaintiff's claims.

establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." 424 U.S. at 701, 96 S.Ct. at 1160–61. The Court acknowledged its prior statement that the fourteenth amendment requires due process " '[w]here a person's good name, reputation, honor, or integrity is at stake *because of what the government is doing to him* . . . . ' " 424 U.S. at 708, 96 S.Ct. at 1164 (quoting *Constantineau*, 400 U.S. at 437, 91 S.Ct. at 510). The Court read this language, however, as referring "to the fact that the governmental action taken in that case deprived the individual of a right previously held under state law—the right to purchase or obtain liquor in common with the rest of the citizenry." *Id.*

The Court concluded that its prior decisions had established "no constitutional doctrine converting every defamation by a public official into a deprivation of liberty within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Id.* at 702, 96 S.Ct. at 1161. Instead, according to the Court, it was the distinct alteration or extinguishment of a right or status recognized by state law, in addition to the interest in reputation, which invoked the protections of the due-process clause. *See id.* at 711, 96 S.Ct. at 1165.

■■ Courts have generally interpreted *Paul* as setting forth a 'stigma-plus' test: to establish that he or she has been deprived of a liberty interest in reputation sufficient to implicate the procedural protections of the due process clause, a plaintiff must show stigma plus the alteration or extinguishment of some other right or status. *See, e.g.*, *Valmonte v. Bane*, 18 F.3d 992 (2d Cir.1994); *Bohn v. County of Dakota*, 772 F.2d 1433 (8th Cir.1985), *cert. denied*, 475 U.S. 1014, 106 S.Ct. 1192, 89 L.Ed.2d 307 (1986); *Marrero v. City of*

*Hialeah*, 625 F.2d 499 (5th Cir.1980), *cert. denied sub nom.* *Rashkind v. Marrero*, 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981).[7] Applying the stigma-plus test in this case, the court finds that the plaintiff has established a substantial likelihood of success in showing that the Community Notification Act will deprive him of a liberty interest protected by the due process clause.

The plaintiff here is likely to succeed in showing, as a matter of fact, that community notification under the Act will seriously damage his reputation and standing in the community. While it might seem that a convicted felon could have little left of his good name, community notification in this case will inflict a greater stigma than would result from conviction alone. Notification will clearly brand the plaintiff as a "criminal sex offender" within the meaning of the Community Notification Act—a 'badge of infamy' that he will have to wear for at least 25 years—and strongly implies that he is a likely recidivist and a danger to his community. The plaintiff is therefore likely to pass the first part of the stigma-plus test.

The plaintiff is also likely to succeed in showing the existence of at least three well-recognized 'plus-factors.'

First, like the law struck down in *Constantineau*, the Community Notification Act deprives the plaintiff of rights previously held under State law. By virtue of having been deemed a 'criminal sex offender' within the meaning of the Act, the plaintiff no longer has the right establish a new residence without giving prior notice to government officials. *See* 1975 Ala. Code § 15–20–22(d). He no longer has the right to live and work within 1,000 feet of a school or childcare facility. *See id.* § 15–20–22(e). He no longer has the right to live with a minor who is not his biological or adoptive child. *See id.* § 15–20–22(g). And he no longer has the right to change

---

**7.** In *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

his name. *See id.* § 15–20–22(i). Whereas the Wisconsin statute at issue in *Constantineau* deprived those deemed to be a danger to their communities of only one right—"the right to purchase or obtain liquor," *Paul,* 424 U.S. at 708, 96 S.Ct. at 1164—the Community Notification Act deprives anyone deemed to be a 'criminal sex offender' of many. These additional deprivations therefore suffice to establish the 'plus' part of the stigma-plus test. *See, e.g., Doe v. Pataki,* 3 F.Supp.2d 456, 468 (S.D.N.Y.1998).

Second, the plaintiff is likely to succeed in showing, as the plaintiff in *Roth* could not, that the Community Notification Act will foreclose his freedom to take advantage of housing and employment opportunities well beyond those expressly forbidden. There can be little doubt that prospective employers and sellers or lessors of real estate will think twice before doing business with an individual deemed to be a likely recidivist and a danger to his community, and, because the Act allows government officials to notify communities through the local media and the Internet, it is likely that at least some of these prospective business partners will become aware of the State's warning. To the extent that such opportunities are foreclosed, the plaintiff will have satisfied the 'plus' part of the stigma-plus test. *See, e.g., Cutshall v. Sundquist,* 980 F.Supp. 928, 933 (M.D.Tenn.1997).

Third, and finally, the Community Notification Act will deprive the plaintiff of a legitimate privacy interest in his home address.[8] The Act mandates disclosure of the plaintiff's home address when notifying his community, *see* 1975 Ala.Code § 15–20–21(a)(2), and the Eleventh Circuit has repeatedly held that individuals have "an important privacy interest" in such infor-

mation. *O'Kane v. United States Customs Serv.,* 169 F.3d 1308, 1310 (11th Cir.1999) (per curiam); *accord Federal Labor Relations Auth. v. United States Dep't of Defense,* 977 F.2d 545, 549 (11th Cir.1992); *cf. United States Dep't of Defense v. Fed. Labor Relations Auth.,* 510 U.S. 487, 501, 114 S.Ct. 1006, 1015, 127 L.Ed.2d 325 (1994) (holding that individuals have a "nontrivial privacy interest" in nondisclosure of their home addresses). It is true, of course, that home addresses are sometimes available in telephone directories, voter registration lists, and other public records. But "[j]ust because the information 'is not wholly "private" does not mean that a person has no interest in limiting disclosure or dissemination of the information.'" *Federal Labor Relations Auth. v. United States Dep't of Defense,* 977 F.2d at 549 (quoting *Department of Justice v. Reporters Comm. for Freedom of Press,* 489 U.S. 749, 770, 109 S.Ct. 1468, 1480, 103 L.Ed.2d 774 (1989)); *accord United States Dep't of Defense v. Fed. Labor Relations Auth.,* 510 U.S. at 500, 114 S.Ct. at 1015. The plaintiff clearly has *some* privacy interest in the nondisclosure of his · home address, and community notification under the Act will clearly deprive him of it. This additional deprivation constitutes a third plus-factor to satisfy the stigma-plus test. *See, e.g., Cutshall,* 980 F.Supp. at 933–34; *Doe v. Poritz,* 142 N.J. 1, 662 A.2d 367, 419 (1995).

b. The Process Due

The plaintiff next argues that the process by which state law-enforcement officials determined that he is subject to the Community Notification Act—and therefore subject to community notification—was constitutionally inadequate. He demands notice and a hearing.

---

8. Although the 'right to privacy' is often found to be rooted in the concept of liberty set forth in the due process clauses of the fifth and fourteenth amendments, *see, e.g., Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (and cases cited therein), the plaintiff does not argue for purposes of the prelimi-

nary injunction that the Community Notification Act deprives him of a liberty interest in privacy standing alone. The court therefore considers his right to privacy only in conjunction with his claimed liberty interest in reputation.

■ The Supreme Court has set forth a three-factor balancing test for determining "when, under our constitutional system, judicial-type procedures must be imposed upon administrative action to assure fairness." *Mathews v. Eldridge,* 424 U.S. 319, 348, 96 S.Ct. 893, 909, 47 L.Ed.2d 18 (1976). The court must consider (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335, 96 S.Ct. at 903.

■ The plaintiff's private interests here are substantial. Community notification under the Act will likely affect his interests in reputation, employment, free movement and privacy, as explained above, and it will continue to do so for the next 25 years. As a result, the plaintiff has a weighty interest in an accurate determination of whether the Act applies to him. *See, e.g., E.B. v.. Verniero,* 119 F.3d 1077, 1107 (3d Cir.1997), *cert. denied sub nom. W.P. v. Verniero,* —— U.S. ——, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998); *Doe v. Pataki,* 3 F.Supp.2d at 469; *cf. Fusari v. Steinberg,* 419 U.S. 379, 389, 95 S.Ct. 533, 540, 42 L.Ed.2d 521 (1975) (noting that "the possible length of wrongful deprivation . . . is an important factor in assessing the impact of official action on the private interests.").

The risk here of an erroneous deprivation is also substantial. Community notification depends upon, among other things, a determination that an individual is subject to the Act. For an individual like the plaintiff, who was not convicted in an Alabama state court, this determination involves an administrative finding that the individual has committed a crime "which would constitute an offense listed" in the Act.1975 Ala.Code § 15–20–21(a)(1).

Just how this finding is to be made and who is to make it is not clear from the text of the Act. In this case, according to the defendants, it was made by an employee at the Alabama Department of Public Safety after comparing the elements of the crime to which the plaintiff pled guilty with the elements of the crimes listed in the Act. This employee is not a lawyer and has little or no specialized training in the law or law enforcement. He made the comparison without the benefit of any objective standards and did not explain or justify his decision in writing. The plaintiff received no notice and no opportunity to be heard either before or after the determination was made. The procedure followed throughout is apparently unwritten and is applied on an ad-hoc basis.

Under these circumstances, the risk of error is both substantial and apparent, and so is the likely value of additional or substitute procedures. Statutory interpretation is no easy task. Identifying the elements of a crime can vex even the most competent and experienced jurists. *See, e.g., Jones v. United States,* —— U.S. ——, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) (5–4 decision) (holding that provisions of a carjacking statute establishing higher penalties to be imposed when an offense results in serious bodily injury or death set forth additional elements of the offense). And determining whether the elements of two crimes 'compare' may itself call for complicated judgments of both fact and law. Any process by which these judgments are made by an employee without clear qualifications to do so and without the benefit of objective standards contains an unacceptably high risk of error.

In this case, for instance, the relevant federal law defines "child pornography" as a "visual depiction" of "a minor engaging in sexually explicit conduct," 18 U.S.C.A. § 2252(a)(2), and defines "minor" as "any person *under the age of eighteen years,*" 18 U.S.C.A. § 2256(1) (emphasis added), whereas the allegedly comparable state law defines "child pornography" as "any

obscene matter containing a visual reproduction of a person *under the age of 17 years* engaged in any act of sado-masochistic abuse, sexual intercourse, sexual excitement, masturbation, genital nudity, or other sexual conduct." 1975 Ala.Code § 13A-12–192(b) (emphasis added).

To be sure, in order to show that the plaintiff's case falls squarely within the coverage of the comparable state child pornography law, the defendants have now submitted to this court an affidavit by the Customs Agent who investigated the plaintiff's case, setting forth the factual details of the plaintiff's case. This affidavit, however, dramatically demonstrates the need for some type of open factfinding procedure. The issue of whether the plaintiff's conduct falls within the coverage of the comparable state child pornography law is for the State, not this federal court, to decide, but with adequate procedures to comply with the due process clause.

Finally, the State obviously has a substantial interest here, too. The function involved is among the core functions of government—the protection of its citizens from potential danger—and the administrative burden and other public costs that might be associated with additional or substitute procedures will not likely be insignificant. The extent of this added burden, however, is not clear. The court has no information at this time as to how many could be affected by this decision, but the court expects that this number will not be overwhelming. Moreover, the court does not anticipate any additional or substitute procedures to be unduly costly.

Weighing these factors, the court finds that the procedures used here are constitutionally inadequate. Due process is not a fixed concept, but central to its command is the right to prior notice and an opportunity to be heard. *See, e.g., United States v. James Daniel Good Real Property,* 510 U.S. 43, 53, 114 S.Ct. 492, 500, 126 L.Ed.2d 490 (1993) ("The right to prior notice and a hearing is central to the Constitution's command of due process."). "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Constantineau,* 400 U.S. at 437, 91 S.Ct. at 510. Yet the procedures used here gave the plaintiff neither. He has therefore established a substantial likelihood of success on his procedural due process claim.

### 2. Other Claims

Likely success on his procedural due process claim fully entitles the plaintiff to the injunction he seeks as long as he can satisfy the other preconditions for equitable relief. Consideration of the plaintiff's other claims is therefore unnecessary and unwarranted at this time. *See Bowen v. United States,* 422 U.S. 916, 920–21, 95 S.Ct. 2569, 2573, 45 L.Ed.2d 641 (1975) (admonishing the district courts and courts of appeals to avoid reaching constitutional questions unnecessarily); *see also United States v. Raines,* 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960); *Ashwander v. TVA,* 297 U.S. 288, 346–47, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

### B. Irreparable Harm

■ The plaintiff contends that he will suffer irreparable harm to his reputation, psyche and personal associations if community notification is allowed to proceed. Such harms, by their very nature, are not easily measured or redressed by money damages and are thus "common venues for the issuance of a preliminary injunction." *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1310 (11th Cir.1998) (citation omitted). In this case, moreover, the plaintiff will not likely be able to sue after the fact for money damages in state or federal court because of the doctrines of qualified and sovereign immunity. The court is convinced that community notification will likely subject the plaintiff to public opprobrium, stigmatization, shame, embarrassment, and threats of physical harm for which there is no adequate remedy at law.

### C. Weighing the Injuries

The equities in this case weigh in favor of granting a preliminary injunction. The plaintiff faces irreparable harm in the absence of a preliminary injunction, whereas the defendants will suffer little or no harm by a delay in notification. The injuries that would be inflicted on the plaintiff by community notification thus outweigh the damage, if any, that the preliminary injunction might cause the defendants.

### D. The Public Interest

In assessing whether the requested injunction would be adverse to the public interest, the court's inquiry "is necessarily confined to that [harm] which might occur in the interval between ruling on the preliminary injunction and trial on the merits." *United States v. Lambert*, 695 F.2d 536, 540 (11th Cir.1983). The potential harm, of course, is that the plaintiff will victimize an individual in his community who would have been able to avoid such harm if notice had been provided. But the plaintiff has been on probation without incident for three years, and nothing about his prior conduct suggests that he is likely to prey on members of his community before this matter is resolved. These factors, plus the fact that federal, state, and local law enforcement authorities are fully aware of the plaintiff's whereabouts, persuade the court that the potential for harm does not outweigh the other considerations.

### III. CONCLUSION

Although the plaintiff here has been convicted of a deplorable crime, he should still receive the benefit of due process under law—not just for his own sake but for the sakes of us all.

> "[Sir Thomas] More: And go he should, if he was the Devil himself, until he broke the law!
>
> "[William] Roper: So now you'd give the Devil benefit of law!
>
> "More: Yes. What would you do? Cut a great road through the law to get after the Devil?

> "Roper: I'd cut down every law in England to do that!
>
> "More: Oh? And when the last law was down and the Devil turned round on you—where would you hide, Roper, the laws all being flat? This country's planted thick with laws from coast to coast—man's laws, not God's—and if you cut them down—and you're just the man to do it—d'you really think you could stand upright in the winds that would blow then? Yes, I'd give the Devil benefit of law, for my own safety's sake."

Robert Bolt, *A Man for All Seasons* Act I (1962).

An appropriate order will be entered.